[690 NYS2d 241]

Antonio Andon, an Infant, by His Mother and Natural Guardian, Prudencia Andon, et al., Appellants, v 302-304 Mott Street Associates et al., Respondents. (And a Third-Party Action.)

First Department, May 20, 1999

### APPEARANCES OF COUNSEL

*Alexander J. Wulwick* of counsel, New York City (*Roura & Melamed,* attorneys), for appellants.

*Mark S. Cheffo* of counsel, New York City (*Sheila L. Birnbaum* and *Anne Y. Shields* on the brief; *Skadden, Arps, Slate, Meagher & Flom, L. L. P.,* attorneys), for respondents.

### OPINION OF THE COURT

SULLIVAN, J.

Plaintiff Prudencia Andon commenced this action on behalf of herself and her son Antonio to recover for personal injuries sustained by Antonio as a result of exposure to lead-based paint. The injuries allegedly suffered by the infant plaintiff include learning disability, developmental delays in speech and language, emotional behavior problems and communication skills that are below age level. The issue on this appeal is whether the IAS Court erred in granting defendants' motion to compel an IQ examination of the infant plaintiff's mother.

In support of the motion, defendants relied on the affidavit of an expert, Andrew R. Adesman, M.D., Chief of the Division of Developmental and Behavioral Pediatrics, Department of Pediatrics, at Schneider Children's Hospital in New Hyde Park, New York. Dr. Adesman, board certified in pediatrics, stated that he had training and experience in evaluating neurological and developmental delays in children, including interpretation of intelligence tests and determining whether a child is performing to his potential and whether a child's performance has been affected by external environmental sources, including lead. According to Dr. Adesman, exposure to lead is only one of many risk factors for childhood delays such as those claimed to be experienced by the infant plaintiff. In addition, Dr. Adesman states that there are no types of developmental deficits that are specific for lead exposure and that cannot be caused by other factors. Therefore, concluded Dr. Adesman, it is difficult to evaluate properly the causes of plaintiff's problems

"without the careful examination of known significant risk factors for such impairments, including genetic factors. * * *

"Studies that have examined the impact of risk factors on childhood intellectual and cognitive development have concluded that a child's genetic background is a strong predictor of educational performance. Maternal IQ is particularly significant in that it reflects the biological endowment of the child and the intellectual stimulation available in the home. Hence,

information regarding maternal I.Q. is extremely relevant to the assessment of whether a child is performing according to his or her potential, whether or not a child is, in fact, truly 'delayed' and in helping to determining [*sic*] causes of any developmental deficits. * * *

"To assess whether results of [the tests conducted on the infant plaintiff] reflect [his] potential IQ in the absence of lead exposure, it will be extremely helpful to compare the results of these IQ tests with the result of an IQ test administered to [his mother]. In this way, it can be determined whether [the infant plaintiff] is performing as would be expected. * * *

"In short, the injuries claimed by the [infant] Plaintiff can be due in whole or in part to risk factors other than exposure to lead."

In opposition, plaintiffs asserted that defendants showed only a "hypothetical relevance" of the mother's IQ to the question of whether the infant plaintiff's cognitive deficits and emotional behavior problems are causally related to his ingestion of lead-based paint. Plaintiffs urged that the hypothetical possibility that the mother's IQ will suggest some other cause of the infant plaintiff's condition does not amount to a factual demonstration of relevance. The IAS Court, without setting forth the basis of its decision, granted the motion to compel an IQ test of the mother, stating that the admissibility of the test should be determined at the time of trial. We reverse.

In moving to compel an IQ examination of the mother, defendants did not identify any specific provision of the Civil Practice Law and Rules as authority for the relief requested. CPLR 3121 (a), which provides, "After commencement of an action in which the mental or physical condition * * * of a party * * * is in controversy, any party may serve notice on another party to submit to a physical [or] mental * * * examination by a designated physician,"* does not, for its implementation in the first instance, require a court order. If the notice is challenged (*see,* CPLR 3122), the party seeking such an examination, as a preliminary burden, must demonstrate that the mental or physical condition of the party from whom discovery is sought is "in controversy." (*Dillenbeck v Hess,* 73 NY2d 278, 287.) Only then may discovery proceed under the statute.

---

* For purposes of this discussion it makes no difference whether the examination is sought to be conducted by a psychiatrist or a psychologist, since there is no requirement that the specialist be a physician. (*Allen v Aetna Life Ins. Co.,* 256 AD2d 103; *Kavanagh v Ogden Allied Maintenance Corp.,* 92 NY2d 952, 954.)

(*Supra,* at 287.) Defendants have failed to satisfy this burden. Plaintiff mother has asserted no claim for personal injuries of her own. Accordingly, the mother has not placed her mental or physical condition in issue. (*See, Dalley v LaGuardia Hosp.,* 130 AD2d 543, 544; *Koump v Smith,* 25 NY2d 287, 295; *see also, Little v McIntyre,* 289 NJ Super 75, 79, 672 A2d 1271, 1273.) Defendants' contention that there is a correlation between a mother's IQ and a child's intelligence is insufficient; a party's mental or physical condition is not "in controversy" merely because another party has placed such condition in issue. (*Swartz v Koster,* 129 Misc 2d 342, 344; *see also,* 6 Weinstein-Korn-Miller, NY Civ Prac ¶ 3121.01.)

Nor are defendants entitled to conduct an IQ examination of the mother under CPLR 3101, which "broadly mandates *'full* disclosure of all matter material and necessary in the prosecution or defense of an action' " (*Kavanagh v Ogden Allied Maintenance Corp.,* 92 NY2d 952, 954, *supra*) and has been liberally construed "to require disclosure where the matter sought will 'assist preparation for trial by sharpening the issues and reducing delay and prolixity' " (*Hoenig v Westphal,* 52 NY2d 605, 608, quoting *Allen v Crowell-Collier Publ. Co.,* 21 NY2d 403, 406). CPLR 3102 (a) provides the method by which such disclosure is obtainable. The scope of these discovery procedures is quite broad in accordance with this State's policy of permitting "open and far-reaching pretrial discovery." (*DiMichel v South Buffalo Ry. Co.,* 80 NY2d 184, 193, *rearg denied sub nom. Poole v Consolidated Rail Corp.,* 81 NY2d 835, *cert denied* 510 US 816.)

According to defendants, the mother's IQ is probative on the issue of whether the infant plaintiff's deficits are due entirely to exposure to lead-based paint or whether they are genetic in origin. Defendants assert that a maternal IQ test will determine whether there is any genetic similarity between the infant plaintiff's problems and those that may have been experienced by the mother.

In our view, however, since so many variables are involved, the test result will raise more questions than it will answer and hardly aid in the resolution of the question of causality. Even if maternal IQ may be a factor in determining a child's intelligence, extending the inquiry into this area would "dramatically broaden the scope of the litigation" (Wriggins, *Genetics, IQ, Determinism, and Torts: The Example of Discovery in Lead Exposure Litigation,* 77 BUL Rev 1025, 1060 [1997]), turning the fact-finding process into a series of mini-trials

regarding, at a minimum, the factors contributing to the mother's IQ and, possibly, that of other family members. "There is no logical end to the litigation inquiry once individual boundaries are crossed." (*Id.*, at 1061.)

Citing *Davis v Elandem Realty Co.* (226 AD2d 419) and *Wepy v Shen* (175 AD2d 124), defendants argue that an IQ evaluation of the mother is a "logical extension of cases allowing for the disclosure of academic records in cases where there may be a genetic explanation for a child's cognitive performance or for specific injuries claimed." There is a vast difference, however, between the disclosure of available academic records and subjecting a party, who has not injected his or her mental or physical condition into the case, to a mental examination for the purpose of creating evidence. The former is far less intrusive. And, while the questions posed and answers provided during an IQ examination may not, in themselves, be of a confidential nature, it is undeniable that the information obtained—an individual's IQ—is a private and highly personal matter.

Our conclusion in this case is consistent with *Monica W. v Milevoi* (252 AD2d 260), another case seeking damages as a result of the infant plaintiffs' exposure to lead-based paint, where this Court, *inter alia*, affirmed so much of an order as denied defendants' motion to direct plaintiff mother to respond to questions concerning the infant plaintiffs' nonparty siblings' academic background and IQ tests. While the Second Department, without any extended discussion, has directed an IQ test of the mother of an infant alleged to have been injured by lead poisoning (*see, Salkey v Mott,* 237 AD2d 504; *Anderson v Seigel*, 255 AD2d 409), we decline to follow those cases.

Accordingly, the order of Supreme Court, New York County (Jane Solomon, J.), entered June 19, 1998, which, insofar as appealed from, granted the motion of defendants to compel plaintiff Prudencia Andon to appear for an IQ test by an expert designated by defendants, should be reversed, on the law and the facts, without costs or disbursements, and the motion denied.

ELLERIN, P. J., WILLIAMS and SAXE, JJ., concur.

Order, Supreme Court, New York County, entered June 19, 1998, reversed, on the law and the facts, without costs or disbursements, and the motion to compel plaintiff, Prudencia Andon, to appear for an IQ test by an expert designated by defendants denied.