OPINION OF THE COURT
Lewis J. Lubell, J.
This is an action brought by Mrs. K. on behalf of her now 11-year-old son, D.K. (D.K. or infant), to recover for alleged physical, emotional and psychological damage and developmental delays sustained by D.K. as the result of, among other things, alleged physical, sexual and emotional abuse and misconduct by teachers employed by the defendant Mahopac Central School District (the School District) between September 2005 and March 2007. In connection therewith, plaintiff advances causes of action for negligence, negligent hiring, training and retention, fraud and misrepresentation, intentional infliction of emotional harm, false imprisonment, and assault and battery. As described by plaintiffs counsel, the infant is a nonverbal, non-communicative, severely impaired autistic child who is “wholly unable to communicate any of the events to which he was subjected.”
Mrs. K. also advances claims in her individual capacity for the loss of services, society and companionship of D.K, as set forth in the eighth cause of action of the complaint. To the extent that it or the bill of particulars submitted on behalf of Mrs. K. indicate or can be construed as setting forth any harm or injury beyond that, such language is deemed stricken, with prejudice, based upon the representations made by counsel on her behalf in his affirmation in opposition.
Currently before the court are the separately filed motions by the School District for (1) an order compelling discovery from plaintiff pursuant to CPLR 3042 (c) and (d) and 3124 and 3126, and to impose sanctions by reason of plaintiffs willful failure to comply with its demand; and (2) an order compelling Mrs. K. and Mr. K., D.K.’s parents, to appear before Harold J. Bursztajn, M.D., for a psychiatric examination, together with such other and further relief as this court may deem just and proper.
Mr. K., who is also the subject of the relief requested in the second motion, is a nonparty who has not been served with a copy of said motion.
*775 Defendant School District’s motion for an order compelling plaintiff to provide discovery and for sanctions due to plaintiffs alleged willful failure to comply with its demands is granted to the extent that plaintiff is directed to provide a second supplemental response to demands addressing defendant’s demands, as currently pared down. Plaintiff shall also provide authorizations for all outstanding medical records including, but not limited to, those supporting plaintiffs claim of post-traumatic stress disorder. Said responses and authorizations shall be provided by April 26, 2013.
The asserted nonexistence of any demanded documents and efforts made to locate same shall be set forth in an affirmation or affidavit, as the case may be, of one with knowledge. The admission by defendant or an agent of defendant of any fact or facts contained in demanded documents does not constitute an excuse not to produce such disclosure, as is seemingly suggested by plaintiff.
Since a review of the moving and opposition papers indicate that the School District has no objection to the scheduling of depositions of defendants, same shall go forward with all due dispatch.
To any further extent, this motion is denied.
More challenging issues are raised in connection with the School District’s application for an order compelling plaintiff Mrs. K. and nonparty Mr. K., the infant’s parents, to appear before Harold J. Bursztajn, M.D., an Associate Clinical Professor and Co-Founder of the Program in Psychiatry and the Law, Harvard Medical School Department of Psychiatry at the Beth Israel Deaconess Medical Center, for a forensic psychiatric examination “to explore and/or rule out numerous recognized disorders identified by Dr. Bursztajn which could result in D.K’s parents making false and/or exaggerated claims regarding both the incident and his injuries.” More particularly, defendant School District seeks “ ‘a forensically reliable’ evaluation of [D.K.’s] claims through the exploration of potential emotional and interpersonal origins of his parents’ belief that [D.K.’s] reported symptoms and behavioral problems were caused by events that allegedly occurred in school, rather than by age-and disability-related developmental challenges.”
Logistically,
“each parent [would be] . . . examined separately, without the distraction of observation by counsel or audio or video recordings. The examination of each *776 parent will consist of an unstructured interview, a structured interview, and a battery of forensically generally accepted standardized psychological tests and self-report instruments . . . The duration of the examination will be approximately four to six (4-6) hours, with the examinee permitted to take comfort breaks as requested.”
As articulated by Dr. Bursztajn in his affirmation in support dated September 11, 2012, a forensic examination of the infant’s parents is necessary because:
“any determination of potential emotional harm and suffering [for a child of D.K’s age, 11 years old at the time of this decision and order, would] . . . necessarily [be] based primarily on parental observations and reports.
“[P]arental attitudes and emotional dynamics are especially salient [where a child] did not directly report the alleged conduct at issue until [his] parents questioned [him] about events that had by then become public . . . Such prompting can amplify the distortions foreseeably introduced by a developmentally disabled child’s impaired sense of reality. This is even more likely . . . [for D.K.] who ... is largely non-verbal, so that others are the purported witnesses to what allegedly took place in school. “Parents’ understandable sensitivity to alleged mistreatment of a disabled child may lead inadvertently to misattribution of causality and displacement of blame.
“[E]ven in the absence of deliberate coaching, parents may fill in the gaps in a child’s reports and complaints by putting words in the child’s mouth, in what has been called a ‘confusion of tongues’ between parent and child (citation omitted) . . . [I]n evaluating [D.K.’s] claims, it may be helpful to rule out Factitious Disorder (Münchhausen Syndrome) by Proxy (Coletsos et al., 2012).
“The suggestibility of child witnesses and their susceptibility to the influence of parents and other adults is well established by recent psychological research (citations omitted) ... In the present case, the involvement of numerous children and families in generating the allegations adds another potential dimension of social influence and distortion to the parent-child dynamic . . . [T]he pattern of com *777 munications between families as well as within the family warrants exploration.
“[D.K.’s] extensive developmental and treatment records . . . provide substantial documentation to the effect that the claimed effects of the school-related events of the fall and winter of 2006-2007— including tantrums, fighting, and dysfunctional behavior at home — had been observed for at least a year previous to those events. Such indications that the alleged damages may, in part or in whole, have been manifestations of preexisting conditions make it all the more important to explore the possibility of misattribution by means of an examination of the parents.”
Dr. Bursztajn further avers that “Regression Statements” reveal that D.K. significantly regressed in areas such as self-help, language, increases in self-stimulatory behavior, and cognitive skills after vacation or holiday periods and that he regressed in response to staffing changes. Notwithstanding this, D.K.’s individualized education program (IEP) and evaluations reveal that he did not suffer any significant negative developments during the 2006/2007 academic year or subsequently, except the kinds of transitory regression noted in the Regression Statements and his other academic records. Continuing, Dr. Bursztajn indicated that any data to the contrary only appears through the recollections of D.K’s parents and in reports based on their recall. Also, any indication of any intense developmental regression beyond what had normally been observed in response to staffing changes or disruptions in his treatment that occurred after the alleged mistreatment “may, on further evaluation, be found to have been a self-fulfilling parental prophecy.”
Dr. Bursztajn opines that
“[D.K] may have taken his behavioral cues from his parents’ understandable worries, anxieties, and fears, inflamed as those were by escalating hysteria among other parents, which at least in part conditioned their perceptions and expectations of their child. Thus, [D.K.] may have acted and/or been perceived as acting as he was expected to act in those highly stressed circumstances.”
It is noteworthy that plaintiff’s opposition to the School District’s application is not supported by expert submission to the contrary. Instead, plaintiff advances legal opposition including an analysis of the cases upon which the School District *778 relies, while urging the court to exercise its discretion in her favor.
At the outset, the motion is denied as to Mr. K. “since the infant plaintiffs father is not a party to this matter, and he was not served with the motion papers” (Anderson v Seigel, 255 AD2d 409, 410 [2d Dept 1998]; CPLR 3121 [a]). In any event, the application would have been denied for the reasons which follow as to Mrs. K.
As to Mrs. K, although she is a party to this action in a representative capacity and individually to the extent of her derivative claim for loss of services, society and companionship of the infant, her mental condition is not in controversy. Thus, any reliance on CPLR 3121 (a) is misplaced. CPLR 3121 (a) only compels an examination of a party whose mental or physical condition is in controversy. “[A] party’s mental or physical condition is not ‘in controversy’ merely because another party has placed such condition in issue” (Andon v 302-304 Mott St. Assoc., 257 AD2d 37, 40 [1st Dept 1999], affd 94 NY2d 740 [2000], citing Swartz v Roster, 129 Misc 2d 342, 344 [1985]; 6-3121 Weinstein-Korn-Miller, NY Civ Prac ¶ 3121.01).
As such, any relief must derive from CPLR 3101 (a) which directs “full disclosure of all matter material and necessary in the prosecution or defense of an action.”
“CPLR 3101 (a) is to be construed liberally so that there should be disclosure of any material that is even arguably relevant (see Shanahan v Bambino, 271 AD2d 519 [2000]). However, ‘unlimited disclosure is not required, and supervision of disclosure is generally left to the trial court’s broad discretion’ (Palermo Mason Constr. v Aark Holding Corp., 300 AD2d 460, 461 [2002] [internal quotation marks omitted]; see Silcox v City of New York, 233 AD2d 494 [1996]). The essential test is one based on ‘usefulness and reason’ (Andon v 302-304 Mott St. Assoc., 94 NY2d 740, 746 [2000] [internal quotation marks omitted]).” (Lentz v Nic’s Gym Inc., 76 AD3d 998, 998-999 [2d Dept 2010].)
In all respects, however, such determinations need to “reflect[ ] a discretionary balancing of interests” (Andon v 302-304 Mott St. Assoc., 94 NY2d 740, 745 [2000], supra).
The Appellate Division, Second Department, has condoned psychiatric social worker “interviews” of parents to obtain “developmental histories” of infant plaintiffs in connection *779 with yet-to-be-administered psychological, psychiatric and neurological examinations of an infant in actions wherein the infant is alleged to have suffered serious learning disabilities, hyperactivity and other neurological problems as the result of an automobile accident (see Burger v Bladt, 112 AD2d 127, 128 [2d Dept 1985]). The court has also seen fit to compel the IQ testing of an infant plaintiffs mother in a lead paint poisoning case because it was “likely to lead to the discovery of admissible or relevant evidence” (Anderson v Seigel, 255 AD2d 409, 410 [1998]).
Upon affirming the determination of the Appellate Division, First Department, reversing the lower court’s order compelling a plaintiff mother to submit to an IQ examination in a lead-paint poisoning case, the Court of Appeals in Andon v 302-304 Mott St. Assoc. (94 NY2d 740 [2000], supra) sets forth various factors for consideration including: whether the information sought is speculative; whether it would delay proceedings by turning the fact-finding process into a series of mini-trials about what may have contributed to the findings sought to be introduced at trial; and whether, upon consideration of the “crucial” search for truth, the relief sought would create undue delay occasioned by battling experts (94 NY2d at 747).
Finally, and separately stated, the Court noted that consideration should be given to the burden imposed and the personal nature of the information sought, it being well recognized that New York’s liberal discovery provisions are to be balanced against their unnecessarily onerous application and any special burden that an opposing party may suffer (id., citing Kavanagh v Ogden Allied Maintenance Corp., 92 NY2d 952, 954 [1998], quoting O’Neill v Oakgrove Constr., 71 NY2d 521, 529 [1988], rearg denied 72 NY2d 910 [1988]).
Upon ruling as it did in Andon v 302-304 Mott St. Assoc. (257 AD2d 37 [1999], supra), the Appellate Division, First Department, determined that subjecting a parent to an IQ examination for purposes of “creating evidence” is not a logical extension of those cases permitting disclosure of a parent’s academic records where, for example, a genetic explanation for a child’s cognitive performance is sought or in connection with specific injuries claimed (257 AD2d at 41).
Similarly, this court is not persuaded that the forensic psychiatric examination herein sought is a logical extension of an IQ examination such as the Appellate Division, Second Department, allowed in Anderson v Seigel (255 AD2d 409 [1998], *780 supra). There is even a more drastic and vast difference between being compelled to take an IQ examination and being subjected to a four-to-six-hour forensic psychiatric examination which includes an “unstructured interview,” “a structured interview,” and a battery of psychological tests and self-report instruments, albeit with “comfort breaks,” than there is between being compelled to produce academic records and taking an IQ examination (as was noted in Andon v 302-304 Mott St. Assoc. [257 AD2d 37 (1999), supra]). Surely, the burden posed and answers provided during the examination herein sought would elicit more “private and highly personal matter[s]” than the IQ test with which the Court expressed its concern in Andon v 302-304 Mott St. Assoc, (at 41), an issue not expressly addressed in Anderson v Seigel.
In addition, although plaintiff has not presented the court with expert submissions to the contrary, the court is not persuaded that, in the end, any “evidence created” through the structured and unstructured interviews and battery of tests sought to be administered will be conclusive on issues of causation and/or damages. Among other things, admittedly, inquiry should not begin and end with the parents since “the involvement of numerous children and families in generating the allegations adds another potential dimension of social influence and distortion to the parent-child dynamic . . . [T]he pattern of communications between families as well as within the family warrants exploration” (affirmation of Dr. Bursztajn, ¶ 8). Seemingly, there is no logical or definitive end to the inquiry.
Furthermore, the court harbors no doubt that proceedings would be materially delayed were the court to grant the motion, turning the fact-finding process into a series of mini-trials about whether or not and to what extent one or both parents suffer from any disorders identified by Dr. Bursztajn and whether or not and to what extent same may and did result in the making of false and/or exaggerated claims regarding both the incident and D.K.’s injuries. This surely foretells a battle that can only be had between experts, with attendant delays. So many variables are involved that test results and conclusions reached will raise more questions than answers, which, on balance, can hardly aid in the resolution of the question of causality (Andon v 302-304 Mott St. Assoc., 257 AD2d 37, 40-41 [1999], supra).
The court notes that the School District is hardly left defenseless without this requested opportunity to “explore[ ] . . . potential emotional and interpersonal origins of [D.K.’s] *781 parents’ belief that [D.K.’s] reported symptoms and behavioral problems were caused by events that allegedly occurred in school.” Admittedly, the School District already possesses existing evidence, including D.K.’s “extensive developmental and treatment records,” which the School District is persuaded reveals that the “claimed effects of the school-related events of the fall and winter of 2006-2007 — including tantrums, fighting, and dysfunctional behavior at home — had been observed for at least a year previous to those events” (affirmation of Dr. Bursztajn, ¶ 9). The School District also possesses D.K’s “Regression Statements,” IEP and evaluations which it contends shed substantial doubt on the issue of causation.
Based upon the foregoing, the court concludes that the burden of subjecting plaintiff mother to the demanded forensic psychiatric evaluation outweighs any relevance the results would bear on the issues of causation and/or damages.
Accordingly, the School District’s motion for an order compelling Mrs. K. and Mr. K. to appear for a psychiatric examination is denied in its entirety.