[60 NYS3d 5]

Cece & Co. Ltd., as Registered Residual Holder and Nominee for VCG Securities, LLC, et al., Appellants, v U.S. Bank National Association, Respondent.

First Department, August 1, 2017

### APPEARANCES OF COUNSEL

*Chaitman LLP*, New York City (*Lance Gotthoffer* of counsel), for appellants.

*K&L Gates LLP*, Charlotte, North Carolina (*John H. Culver III* of the North Carolina and Maryland bars, admitted pro hac vice, of counsel), and *K&L Gates LLP*, New York City (*Lani A. Adler* of counsel), for respondent.

### OPINION OF THE COURT

Gische, J.

Plaintiffs are the titled and beneficial holders of certain residual interests in real estate mortgage investment conduit (REMIC) trusts. This action, brought against defendant in its capacity as trustee, claims that when the trustee exercised its otherwise valid option to effectuate an early termination of certain trusts, it breached its contractual duties to plaintiffs by purchasing the remaining trust assets in its own name, at millions of dollars below market value. The trustee does not dispute that it purchased the trust assets for its own account at below market value. It claims that under the trust agreements it was expressly authorized to do so. The motion court agreed with the trustee's interpretation of the operative documents and dismissed the complaint. We find, however, that the trustee did not have the right under the trust agreements to personally profit from the sale of the trust assets. Consequently, plaintiffs have stated a viable cause of action for breach of contract.

The REMIC trusts at issue were formed approximately 15 years ago, and consist of pooled securities backed by residential mortgages. They were intended to conform to and receive the federal tax benefits contemplated under Internal Revenue Code (IRC) (26 USC) § 860. The securities represent only two classes of ownership, regular security holders and residual security holders. The rights and obligations governing the parties are set forth in separate trust agreements with substantially identical provisions (trust agreements).[1] While the holders of the regular securities were entitled to receive regular payments on specified distribution dates, the residual security holders were not. Instead, they were only entitled to receive the proceeds of the dispositions of any assets remaining in the trusts after each of the regular security holders' interests had been fully paid. In addition, pursuant to the trust agreements and federal tax law (IRC § 860), the regular security holders' payments were guaranteed by the Government National Mortgage Association (Ginnie Mae), while the residual security holders, who are considered the "equity holders" had no such guarantee of payment. Thus, the residual securities were the riskiest tranche of ownership and any right to payment was subordinate to payment in full of amounts due to the regular security holders. The regular and residual trust interests are also differentiated by the fact that the regular security interests are evidenced by book entries, while the residual security interests are represented by physical certificates, with certain investor rights in the trust agreements defined by this differentiation.

The trust documents limit the trustee's duties to those specifically set forth in the trust agreements (trust agreements § 5.01). They expressly require that the trustee hold all trust assets for the exclusive use and benefit of all present and future holders and otherwise limit the trustee's right to, in any capacity, assert any claim or interest in the trust assets (trust agreements § 4.02).

Although each trust has a specified term by which it terminates, the trust agreements also provide for circumstances permitting early termination. The parties' disputes in this case arise out of the trustee's election to exercise an early termination of certain trusts. Over time, as the underlying mortgages are repaid, the original class principal balances of

---

1. The trust agreements used were all either identical, or identical in form, to the standard Ginnie Mae REMIC trust provisions.

the trust decline. The trust agreements expressly provide that when the original class principal balance of a trust declines to less than 1%, the trustee has the option to effect an early termination.[2] This is commonly called a "clean up call." Article VI, § 6.01 of the trust agreements provides in pertinent part:

> "On any Distribution Date on which the aggregate of the Class Principal Balances of the Securities in a particular Series . . . is less that 1% of the aggregate of the Original Class Principal Balances, the Trustee may, but shall not be obligated to, effect a termination of the related Trust and retirement of the related Securities by purchasing (or causing the sale to one or more third parties of) all of the Trust Assets remaining in the Trust and depositing into the Book-Entry Depository Account the Termination Price therefor."

In the trust agreements' glossary, the "termination price" is defined as "[t]he Aggregate Remaining Balance as of the Termination Date, plus thirty days of accrued interest on the outstanding Trust Assets." This amount is sufficient to satisfy any payments required to be made to the regular security holders.

The full mechanics of liquidation are set forth in article VI of the trust agreements. It requires that the trustee decide whether it is going to purchase the remaining trust assets itself, or sell them to a third party. Notice must then be sent to the security holders specifying a final distribution date. The sale of assets and book-entry deposit of funds sufficient to satisfy the regular shareholders' interest must be consummated before the specified distribution date. On the distribution date, the funds deposited into the book-entry deposit account are available to fully satisfy the remaining interests of the regular security holders. If there are any other available funds after the payment of expenses (cash on hand), the trustee is required to distribute such excess to the residual security holders, upon presentation and surrender of their certificates (trust agreements § 6.01). Any unclaimed funds must be deposited into a termination account and the trust agreements terminate only after all distributions are completed (trust agreements §§ 6.02, 6.03).

---

2. The early termination provision is intended to permit the trustee to end a trust that is no longer profitable, e.g., when the cost of administering the trust exceeds the benefits of operation (26 CFR 1.860G-2 [j]).

The complaint alleges that in 2015 the trustee exercised its option of early termination for seven trusts in which plaintiffs were the residual security holders. The trustee elected to purchase the remaining trust assets for itself at the termination price, fully aware that the market price greatly exceeded the termination price. The trustee is alleged to have then "flipped" these assets by selling them to a third party, realizing a personal profit believed to be in excess of $10 million. No part of the profit was remitted to the trusts or distributed to the residual security holders. Plaintiffs claim that the trustee's conduct was in violation of the trust agreements and derogation of the duties imposed upon commercial trustees by New York law.

Although the financial transaction underlying the dispute is complex, the parties' legal dispute is really quite simple. The parties do not dispute that the trustee had the right to effect an early termination of the trusts based upon the value of the original class principal balance. They do not dispute the termination procedure permitted the trustee the option of either purchasing the remaining trust assets in its own name or selling them to a third party. They do not dispute that if the trustee had elected to sell the remaining assets to a third party, the trustee would have been required to deposit the proceeds (net of the book-entry deposit and expenses) into the trust to be distributed to the residual security holders. The gravamen of the parties' dispute is whether under the terms of the trust agreements, when the trustee elects to purchase the remaining trust assets in its own name, it can do so at the "termination price," which in this case was substantially below the market value. If the trustee has that right, then at its sole option and for its sole financial benefit, it can completely defeat the interest of the residual security holders.

The REMIC trusts at issue are indentures. They bestow legal title of securities on a single trustee, here defendant, that acts to protect the interests of individual investors, who may otherwise be numerous or unknown to one another (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 NY3d 549, 555 [2014]). Unlike an ordinary trustee, the rights, duties and obligations of an indenture trustee are not defined by a fiduciary relationship. Instead, they are defined exclusively by the terms of the agreements by which the relationships were formed (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 11 NY3d 146, 156 [2008]).

That does not mean, however, that an indenture trustee does not owe security holders a duty of care. An indenture trustee clearly owes the security holders a duty to perform its ministerial functions with due care (*AG Capital*, 11 NY3d at 157). Most importantly, the courts have recognized that even an indenture trustee has a fundamental duty to avoid conflicts of interest (*id.* at 156-157; *see Commerce Bank v Bank of N.Y. Mellon*, 141 AD3d 413, 416 [1st Dept 2016]; *United States Trust Co. of N.Y. v First Natl. City Bank*, 57 AD2d 285, 296 [1st Dept 1977], *affd* 45 NY2d 869 [1978]; *see also Elliott Assoc. v J. Henry Schroder Bank & Trust Co.*, 838 F2d 66, 71 [2d Cir 1988]). Avoiding conflicts of interest encompasses a trustee's duty "not to profit at the possible expense of [the] beneficiary" (*Dabney v Chase Natl. Bank of City of N.Y.*, 196 F2d 668, 670 [2d Cir 1952]). Where the indenture itself gives the trustee rights that are seemingly in conflict with the beneficiary, there is no legal bar (*Elliott Assoc.*, 838 F2d at 71). The trustee's legal duty, as an indenture trustee, is reflected in trust agreements § 4.02 (a) and (b), which acknowledge that the trustee holds the assets for the exclusive use and benefit of the security holders and prohibits the trustee from asserting a claim against the trust assets in any capacity, except as otherwise permitted by the trust agreements themselves.

At bar, while the trustee had an express right to purchase the remaining trust assets in its own name, there was no express contractual right to purchase the assets at less than market value. In the absence of an express contractual right to do so, the trustee's action clearly constitutes a prohibited conflict of interest, because it financially benefitted the trustee at the expense of the residual security holders. The trustee completely defeated the equity value of the trust assets that belonged to the residual security owners by usurping the profitable value of the assets for itself.

There is nothing in the trust agreements that expressly permits the trustee to purchase the trust assets for less than their fair market value. The trustee argues that the trust documents permit it to purchase the trust assets for the termination price, which is defined in the trust agreements as the value of the regular shareholders' interest, plus 30 days of interest. That "right," however, is not clearly delineated in the trust agreements. The language in section 6.01 of the trust agreements that the trustee relies on merely permits the trustee to terminate the trust by purchasing the assets. There is no express reference to a purchase price or some other equiv-

alent language. The sole reference in section 6.01 to the termination price is only a requirement that the trustee must deposit such amount in the "book-entry depository account."[3] The obligation to deposit a sum certain into a book-entry depository account does not equate to the trustee having the right to purchase the trust assets for the sum that must be deposited. Nor does it set a ceiling price that the trustee can pay for the assets. Indeed, the trust agreements expressly require that any assets in excess of the termination price received by the trustee qualify as cash on hand, which must be distributed outright to the residual security holders (trust agreements § 6.01 [b]). As a practical matter, there could never be any cash on hand, and this provision would. be rendered entirely superfluous, if the trustee's interpretation of the trust agreements is accepted. Contrary to the trustee's argument, its action to profit itself is not simply an inherent financial risk the residual security holders undertook when they decided to invest in the securities. The value of their investment, under such circumstances, would not be market driven, but dictated by whatever the trustee chooses to do ("Heads I win, Tails I win"). Such interpretation of the trust agreements is untenable and inconsistent with the trustee's general contractual duties to act on behalf of all security holders.

Nor does section 6.02 of the trust agreements clearly provide that the trustee may purchase the trust assets at the termination price. This provision concerns termination of the trust agreements and provides, among other things, that the trustee's obligations "shall terminate upon (a) the payment of all principal and accrued interest on the Securities . . . and all other amounts due and owing by the Trustee under such Trust Agreement." One of the conditions for termination of the trust is that the trust assets be purchased "at a price equal to the Termination Price." Such language reflects a threshold amount that must be met before the trust can be terminated, not a cap on the amount that is required to be paid for the assets.[4, 5]

---

**3.** Under the trust agreements only the regular holders have book-entry securities; the residual security holders have certificated securities (trust agreements § 2.01). Thus, the termination price, which reflects the regular shareholders' financial interests, is the only amount that can be deposited into a book-entry depository account.

**4.** The trust agreements were developed by Ginnie Mae. Ginnie Mae was the guarantor of the regular security holders' interest. It makes sense that Ginnie Mae would require that the early termination price cover, at a minimum, the financial interests that Ginnie Mae undertook the risk to pay.

**5.** Plaintiffs also contend that the trustee's interpretation would

We recognize that under the trust agreements, the trustee's stated compensation for "all services" is a trustee fee calculated in accordance with the agreement (trust agreements § 5.05). There is no clear provision giving the trustee any right to additional fees and/or compensation by selling trust assets for its own account.

We also reject the trustee's argument that once it purchased the trust assets in its own name, whatever responsibilities it had to plaintiffs under the trust documents terminated. The trust agreements provide that the obligations of the trustee continue at least through the trust termination date, which is when the assets are actually distributed to the security holders. The termination date cannot occur until after any sale of the trust assets is consummated. We also find unpersuasive the trustee's argument that because it did not have to elect an early termination, but could have operated the trust until the assets had no value, it had no obligation upon early termination to purchase or sell the trust assets at a price that would benefit the residual security holders. While the trustee had the right to either elect or not elect an early trust termination, having made such election, it was obligated to act in conformance with its contractual duties.

Notwithstanding our determination that plaintiffs have stated a claim for breach of contract, we find that their claims for conversion and anticipatory beach of contract were properly dismissed. The anticipatory breach claim fails because the complaint merely alleges that defendant had a unilateral obligation to pay money (*see Long Is. R.R. Co. v Northville Indus. Corp.*, 41 NY2d 455, 466 [1977]; *Acacia Natl. Life Ins. Co. v Kay Jewelers*, 203 AD2d 40, 43 [1st Dept 1994]). The claim for conversion fails because it is duplicative of plaintiffs' breach of contract claims (*Sebastian Holdings, Inc. v Deutsche Bank, AG.*, 108 AD3d 433 [1st Dept 2013]).

---

jeopardize the favorable tax treatment otherwise afforded REMICs (IRC § 860 [f]). Defendant argues that clean up calls are exempted from prohibited transactions that would otherwise void the tax benefits. Because, however, we do not agree with defendant's interpretation of the trust agreements, we do not reach the issue of whether the federal tax benefits would be lost were we to decide otherwise. Certainly, making sure these contracts are consistent with their tax purpose is an important consideration and any interpretation that voids the tax benefit intended should be avoided (*see Shedlinsky v Budweiser Brewing Co.*, 163 NY 437, 439 [1900]; *Federal Ins. Co. v Americas Ins. Co.*, 258 AD2d 39, 44 [1st Dept 1999]).

We have considered plaintiffs' remaining arguments and find them unavailing.

Accordingly, the order of the Supreme Court, New York County (Jeffrey K. Oing, J.), entered March 3, 2016, which granted defendant's motion to dismiss the complaint, should be modified, on the law, to the extent of reinstating the breach of contract claim, and otherwise affirmed, with costs against respondent.

ACOSTA, P.J., MANZANET-DANIELS, MAZZARELLI and KAHN, JJ., concur.

Order, Supreme Court, New York County, entered March 3, 2016, modified, on the law, to reinstate the breach of contract claim, and otherwise affirmed, with costs against respondent.