Kenyon & Kenyon LLP v Sightsound Tech., LLC (2022 NY Slip Op 00969)





Kenyon & Kenyon LLP v Sightsound Tech., LLC


2022 NY Slip Op 00969


Decided on February 15, 2022


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 15, 2022

Before: Gische, J.P., Webber, Mendez, Rodriguez, Pitt, JJ. 


Index No. 650795/14 Appeal No. 15144 Case No. 2021-02120, 2021-02121 

[*1]Kenyon & Kenyon LLP, Plaintiff-Appellant,
v
Sightsound Technologies, LLC, a Delaware Limited Liability Company, et al., Defendants-Respondents.


Ice Miller LLP, New York (Louis T. DeLucia of counsel), for appellant.
Robinson & Cole LLP, New Yok (Brian J. Wheelin of counsel), for Sightsound Technologies, LLC, DMT Licensing, LLC and General Electric Company, respondents.
Reiss Sheppe LLP, New York (Matthew Sheppe of counsel), for Sightsound Technologies Holdings, LLC, respondents.



Order, Supreme Court, New York County (Andrea Masley, J.), entered August 2, 2019, which, to the extent appealed from, granted defendants' motion for summary judgment dismissing the conversion claim, and order, same court and Justice, entered May 11, 2021, which, after a nonjury trial, dismissed the complaint in its entirety, unanimously affirmed with costs.
This lawsuit concerns the issue of whether plaintiff, a law firm, subordinated its priority security lien in defendant SightSound's patented technology related to selling digital video and audio recordings electronically through the Internet. SightSound originally retained plaintiff to provide it with legal advice on protecting its intellectual property and to prosecute a case for patent infringement against N2K. By July 2001 SightSound had amassed a large debt to plaintiff and could no longer afford to pay its legal fees in pursuit of the litigation.
As a consequence, in October 2001, plaintiff and SightSound entered into a Security Agreement pursuant to which plaintiff would forebear on enforcement of its fees in exchange for a secured first priority lien in SightSound's assets, "now owned or at any time hereafter acquired" by SightSound. The assets, defined as the "Collateral," include SightSound's patents, patent licenses, and "to the extent not otherwise included all Proceeds and products of any and all of the foregoing (including, without limitation, license royalties and proceeds of infringement suits)" (Security Agreement §3). The Security Agreement also prohibited the sale or transfer of the Collateral without plaintiff's written prior consent (Security Agreement §§5.5[a], 20.1). "Proceeds" was defined to include the proceeds of infringement lawsuits (Security Agreement §3). In 2004, the N2K litigation settled, and plaintiff received half of the settlement proceeds, or some $1.6 million.
SightSound believed it had additional financially valuable patent infringement claims against other entities, most notably Napster and Apple. Plaintiff commenced an action against Napster on SightSound's behalf, but SightSound was unable to finance the additional patent infringement litigations and began searching for outside financing. Eventually it reached an agreement with defendant General Electric (GE). In November 2005, SightSound and GE's subsidiary DMT, entered into an Asset Purchase Agreement (APA).
Under the APA, SightSound agreed that "SightSound has, and at the Closing will convey to, DMT good and valid title in and to the Assets, free and clear of any Encumbrances (other than those Encumbrances set forth on Schedule 2.1) (Security Agreement §4.5) and that DMT was acquiring the "assets" of SightSound, including: "(a) the Patents," "(b) the License Agreements in effect as of the Closing Date, including the right to receive all Revenues . . . . in connection therewith, received after the Closing Date (and subject to the terms of Section 7 below)," and "(e) the Settlement Agreements[*2]; and (f) all past, present and future claims of infringement of any of the Patents" (APA §§2.1 [a] through [f]). It was agreed that DMT would fund all the expenses relative to the patents, including infringement lawsuits, and the cost of reexamination of SightSound's patents by the Patent and Trademark Office (PTO). The APA explicitly referenced plaintiff's security interest pursuant to its Security Agreement with SightSound, referred to as lien release expenses, but expressly provided that DMT was not assuming any of SightSound's liabilities (APA §2.3). Insofar as relevant to this dispute the APA provides:
7.2. Revenues Received On or After the Closing Date.
(a) Notwithstanding anything in this Agreement to the contrary, any and all Revenues, regardless of when earned, shall be the property of DMT and the calculations described in this Section 7.2 shall be performed solely for purposes of determining the amount of the Contingent Purchase Price required to be paid by DMT to SightSound pursuant to Section 2.2.
Section 7.2(c) of the APA further provides that:
With respect to the sharing of Revenues, section 7.2 of the APA further provides for a waterfall provision as follows:
"(i) first, to DMT until the aggregate amount of the Patent Exploitation Expenses incurred during the preceding calendar quarter and any prior periods has been paid to DMT; and thereafter
(ii) second, to an escrow account, not subject to the Expense Rate, designated by DMT (which escrow account shall have an aggregate amount at all times of up to $5,000,000), from time to time, to the extent determined by DMT as necessary to fund future anticipated working capital or other expenses; provided, however, that neither the establishment of such escrow account nor DMT's deposit of any amounts in such escrow account shall obligate DMT to expend any such funds; and thereafter
(iii) third, fifty percent (50%) to SightSound or its designee and fifty percent (50%) to DMT"
Under the APA DMT retained the sole right to designate whether plaintiff's lien would be paid first as part of the "Patent Exploitation Expenses" or last as part of SightSound's distribution. The APA defines "Revenues" as "all receipts of cash (net of withholding taxes) or other property following the Closing Date pursuant to License Agreements." The definition includes an express reference to section 3.1 of the APA, which provides DMT with the right to exploit the patents.
Since the APA required plaintiff's consent pursuant to the Security Agreement, plaintiff, DMT, and SightSound simultaneously entered into an agreement memorializing plaintiff's consent to the transfer (Consent Agreement). In relevant part, the Consent Agreement states that "DMT will rely upon this Agreement in connection with consummating the Sale and performing its obligations under the Asset Purchase Agreement and that:
"DMT and SightSound are entering into an Asset Purchase Agreement . . . a true and correct copy of which is attached [*3]hereto for reference as Exhibit A, pursuant to which SightSound agrees to sell, and DMT agrees to purchase, the Assets, including the Patents, on the terms set forth in the Asset Purchase Agreement etc. for reference as Exhibit A."
The Consent Agreement provides that "Capitalized terms used in this Agreement without definition shall have the respective meanings ascribed to them in the Asset Purchase Agreement" and contains references to "Revenues" that are "otherwise payable to SightSound pursuant to Section 7.2(c) of the Asset Purchase Agreement . . . ." The Consent Agreement also provides in section 3 that "DMT acknowledges that the Assets are and remain subject to the Lien Holder Encumbrances on the terms set forth in the Security Agreement" and that plaintiff is still "the sole legal and beneficial owner of the Lien Holder Encumbrances . . . ." It was agreed that plaintiff would forbear on enforcing its legal fees (then $5,543,487) to allow for PTO's reexamination of the SightSound patents. At that time DMT would decide which of the patents it would keep and plaintiff would have the following options:
"[Either] to have all indebtedness and obligations of SightSound to the Lien Holder [plaintiff] satisfied fully by (i) payment of such indebtedness by SightSound or any other Person on SightSound's behalf, or (ii) electing to receive from SightSound, in perpetuity, 10% of any Revenues otherwise allocable to SightSound ... pursuant to Section 7.2(c) of the Asset Purchase Agreement."
Section 5 of the Consent Agreement sets forth plaintiff's consent to the APA:
"(5) Consent to the Sale. [Plaintiff] hereby consents, pursuant to the terms hereof, to the Sale and acknowledges and agrees that DMT, as a result of the Sale or otherwise, shall not assume any of the Excluded Liabilities (including, without limitation, any liabilities or obligations of SightSound to, or otherwise relating to [plaintiff])."
Plaintiff's representation in the SightSound litigations ended in November 2005, coinciding with execution of the APA and Consent Agreement. DMT assumed all the expenses of the ongoing Napster litigation, funded the PTO reexamination process, and funded the commencement of a patent infringement lawsuit against Apple by a different law firm. After the patent reexamination was finalized in December 2010, DMT elected to hold the patents and the parties (DMT, SightSound, and plaintiff) entered into an Amended Consent Agreement extending plaintiff's time to exercise its payments options into 2012. As with the Consent Agreement, DMT, SightSound and plaintiff agreed that SightSound's assets remained subject to plaintiff's encumbrances, as set forth in the Security Agreement, and the terms of the amended agreement are virtually identical to those in the original Consent Agreement.
In April 2012, before plaintiff's time to exercise its payments option expired, the Napster litigation settled for $3.1 million. The Patent Exploitation Expenses, without considering [*4]plaintiff's security interest, exceeded the recovery amount. In a May 4th email, SightSound's CFO, notified plaintiff of the settlement, stating that "[a]s you know, under the terms of the Asset Purchase Agreement, revenue realized in connection with licensing or litigation settlement is first distributed to DMT until the Preferred Distribution is satisfied," consistent with the waterfall provisions of section 7.2(c) of the APA. Plaintiff disagreed and demanded payment of lien for unpaid legal fees of $5,483,547. It simultaneously renounced its option to indefinitely share in 10% of SightSound's future proceeds on the patents. This action ensued. Following motion practice and a prior appeal, the issues presently on this appeal are whether plaintiff's conversion claim was properly dismissed on summary judgment and whether the remainder of the complaint was properly dismissed after a bench trial.
Central to the parties' dispute is whether, under the Consent Agreement, plaintiff had agreed to alter its priority of the payment of its security interest and subordinate it to the waterfall provision in the APA. We agree with the trial court that the Consent Agreement is ambiguous on this issue and that, therefore, consideration of extrinsic evidence was justified (see World Ambulette Transp., Inc. v Lee, 161 AD3d 1028, 1031-1032 [2d Dept 2018]). We agree that reference to the APA in section 5 of the Consent Agreement, and its attachment to the Consent Agreement create an ambiguity about whether plaintiff agreed to the waterfall provisions in the APA in connection with providing its consent. Consequently, the trial court correctly considered extrinsic evidence in aid of interpretation, which in this case properly included conduct of the parties after the contract was formed (Federal Ins. Co. v American Ins Co, 258 AD2d 39, 44 [1st Dept 1999]).
After consideration of extrinsic evidence, the trial court rejected plaintiff's claim, that it did not agree to the terms of the APA, was unaware of it, and even if aware of it, could not be bound because it was not a party thereto. We defer to the trial court's findings that plaintiff's witnesses were not credible on this point (Moore v Beautiful Spaces, LLC, 192 AD3d 591, 591 [1st Dept 2021]).
We also find unpersuasive plaintiff's argument that even if its security interest became subordinate to the APA waterfall provision, the reference to "Revenues" in section 7.2(c) of the APA did not include "any revenue generated from the patents," but rather was limited only to licensing revenues. The APA which broadly defines revenues as "all receipts of cash (net of withholding taxes) or other property" expressly references section 3.1, which provides that DMT has the "right to exploit the Patents," including the right to prosecute, maintain and enforce the patents. The trial court correctly concluded that revenues include the proceeds of the settlement of patent law suits prosecuted in order to exploit SightSound's [*5]patents. There is no basis in the APA agreement itself to distinguish between those circumstances in the APA when revenues are stated with a capital "R" or a lower case "r."
Because we agree that plaintiff consented to the APA waterfall provisions, plaintiff was not entitled to any money from the Napster settlement. The court correctly dismissed plaintiff's claims for breach of contract, specific performance, or unjust enrichment.
Plaintiff's fraudulent conveyance claim was also correctly dismissed. While the payment was made to an insider for an antecedent debt, it was made with plaintiff's prior consent, as evidenced by the Consent Agreement, in exchange for an arrangement to maximize plaintiff's chances of recovering on its own debt, and thus the transaction was carried out in good faith, which constitutes fair consideration (see Farm Stores v School Feeding Corp., 102 AD2d 249, 253-254 [2d Dept 1984], affd in part, appeal dismissed in part 64 NY2d 1065 [1985]).
The conversion claim was correctly dismissed on summary judgment because no claim for conversion lies where the monies are not a "specific, identifiable fund" (see Amity Loans v Sterling Natl. Bank & Trust Co. of N.Y., 177 AD2d 277, 279 [1st Dept 1991] [internal quotation marks omitted]), and in any event at trial plaintiff did not show it had "legal ownership or an immediate superior right of possession" to the Napster proceeds over defendants (National. Ctr. for Crisis Mgt., Inc. v Lerner, 91 AD3d 920, 920 [2d Dept 2012]). THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: February 15, 2022