Finkelstein v Bank of N.Y. Mellon (2025 NY Slip Op 51188(U))

[*1]

Finkelstein v Bank of N.Y. Mellon

2025 NY Slip Op 51188(U)

Decided on July 23, 2025

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 23, 2025
Supreme Court, New York County

Stephen Finkelstein, Plaintiff,

against
The Bank of New York Mellon, AS TRUSTEE (AND ANY PREDECESSORS OR SUCCESSORS THERETO), Defendant.
STEPHEN FINKELSTEIN, Plaintiff,
against
THE BANK OF NEW YORK MELLON, AS TRUSTEE (AND ANY PREDECESSORS OR SUCCESSORS THERETO), Defendant.

Index No. 651222/2021

Counsel for Plaintiff: John M. Lundin, Alexandra M.C. Douglas, and Niall D. Ó Murchadha of Lundin PLLC
Counsel for Defendant: Matthew D. Ingber, Christopher J. Houpt, and Christopher J. Mikesh of Mayer Brown LLP

Margaret A. Chan, J.

The following e-filed documents, listed by NYSCEF document number (MS002, 651222/2021) 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 68, 104 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (MS004, 651222/2021) 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 120, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 137 were read on this motion to/for AMEND CAPTION/PLEADINGS.
The following e-filed documents, listed by NYSCEF document number (MS002, 653713/2022) 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 59, 62, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 79 were read on this motion to/for AMEND CAPTION/PLEADINGS.
In these actions arising from defendant Bank of New York Mellon's (BNYM) alleged breach of contractual obligations as the trustee for several residential mortgage-backed securities (RMBS) trusts, plaintiff Stephen Finkelstein (plaintiff) moves pursuant to CPLR 3025(b) for leave to amend the operative complaints in Index Nos. 651222/2021 (Finkelstein I or FI)[FN1]
and 653713/2022 (Finkelstein II or FII, and together with Finkelstein I, the Finkelstein Actions) (see FI, NYSCEF # 107; FII, NYSCEF # 48). BNYM opposes plaintiff's motions.[FN2]
For the following reasons, plaintiff's motions are granted in part and denied in part.
Background
Factual Background of Plaintiff's Claims
Plaintiff is the beneficial owner of six certificates issued by five RMBS trusts (Finkelstein I, NYSCEF # 108 [FN3]
— PAC ¶¶ 24-28, 36, 51-52). The five trusts at issue in this action are CXHE 2004-B, CXHE 2006-A, GEWCMC 2005-2, NMFT 2006-MTA1, and FHASI 2005-AR6 (the Trusts) (id. Exs 1 & 7). These Trusts pool together thousands of individual mortgage loans, and BNYM serves as their trustee (id. ¶¶ 12, 36). The Trusts closed between 2004 and 2006 (see id. Ex 8).[FN4]

Each of the Trusts are governed by a pooling and servicing agreement (PSA) and other similar agreements (the Governing Agreements) (see id. ¶¶ 12, 14, 23, 39; see also Finkelstein I, NYSCEF #s 39, 41, 42).[FN5]
The Governing Agreements typically required that the entity transferring the mortgage loans (the Seller) to the Trusts' depositor (the Depositor) provide certain documents to the Trusts and make certain representations and warranties (R&Ws) concerning the mortgage loan and related files (PAC ¶¶ 14, 41-42, 53-54). These R&Ws were important to the value and risk of the mortgage loans pooled into the Trust (id. ¶ 54). Hence, as a further obligation set forth in the Government Agreements, the mortgages' warrantors (the Obligors) were required to cure any identified document defect or R&W breach that had a material and adverse effect on the Trusts' mortgages (id. ¶¶ 55, 57). If the Obligors failed to do so, they became obligated to either substitute the defective loan with a loan of adequate credit quality or repurchase the defective loan (see id.¶¶ 56, 58).
In its capacity as trustee, BNYM undertook certain contractual duties set forth in the PSAs and Governing Documents (see PAC ¶¶ 12-13, 36, 50-52, 69). For example, BNYM had a duty to take physical possession of the mortgage files pursuant to certain conveyance terms set forth in the PSA (id. ¶¶ 61-63). The PSAs also required BNYM to (1) identify any document defects in the mortgage files, (2) identify any R&W breaches set forth in the Governing Documents, and (3) notify other parties to the PSA, as well as the Obligor, of such defects or breaches (id. ¶¶ 64-66; see e.g. FI, NYSCEF # 39 § 2.02; FI, NYSCEF # 41 § 3.06; FI, NYSCEF # 42 § 3.06). In those cases where BNYM discovered, or otherwise gave the requisite notice of, a document defect or R&W breach, it was obligated to have the Obligor cure the defect (see PAC ¶ 68).
For some Trusts, BNYM was also tasked with enforcing the Obligors' obligations in the event that the Obligor failed to cure a document defect or R&W breach within a specified period (see id. ¶¶ 69-72; NYSCEF # 39 § 2.03 ["if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Originator under the related Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within 90 days after the date on which the Originator was notified"]; but see FI, NYSCEF # 41 §§ 3.04, 3.06; FI, NYSCEF # 42 §§ 3.04, 3.06). And, upon the occurrence and continuation of an actual event of default, the PSA typically required BNYM to "exercise such of the rights and powers vested in it" by using "the same degree of care and skill in their exercise as a prudent person would exercise (see PAC ¶ 228).[FN6]

As alleged, BNYM breached its obligations under the PSA by failing to, among other things, require the Trusts' Obligators to cure identified document defects and R&W breaches (see PAC ¶¶ 13, 103-227). Due to these breaches, when the defective mortgages pooled into the Trusts later defaulted, the Trusts lost part or all of their value (see id. ¶¶ 13, 19).
Relevant Procedural History and the PAC
On February 22, 2021, plaintiff commenced Finkelstein I in connection with the CHXE 2004-B, CXHE 2006-A, GEWMC 2005-2, and NMFT 2006-MTA 1 trusts, and on October 7, 2022, commenced Finkelstein II in connection with the FHASI 2005-AR6 and NMFT 2006-MTA1 trusts (FI, NYSCEF # 1; FII, NYSCEF # 1). In Finkelstein I, plaintiff asserted (1) a breach of contract claim in connection with BNYM's alleged failure to require the Obligors to either cure any document defects in the mortgage loan files or to repurchase or substitute another mortgage loan for the improperly document mortgage loans, and (2) a claim for declaratory judgment that BNYM is not entitled to any indemnification or reimbursement from any of the trusts for any fees, expenses, or losses incurred in this action (see FI, NYSCEF # 6 ¶¶ 132-1138). Meanwhile, in Finkelstein II, plaintiff asserted (a) a breach of contract claim in connection with BNYM's alleged failure to require the Obligors to either cure any document defects in the mortgage loan files or to repurchase or substitute another mortgage loan for the improperly document mortgage loans, (b) a breach of contract claim addressing BNYM's purported use of trust funds to indemnify, advance, or reimburse itself for attorneys' fees, and (c) a claim for declaratory judgment that BNYM is not entitled to any indemnification or reimbursement from any of the trusts for any fees, expenses, or losses incurred in this action (FII, NYSCEF # 5 ¶¶ 126-146).
On February 22, 2022, BNYM moved to dismiss the complaint in Finkelstein I (FI, NYSCEF # 35). Among other things, BNYM argued that plaintiff's claims were time barred and were not rescued by any applicable tolling, plaintiff otherwise failed state a claim based on document defects, and that plaintiff's declaratory judgment claim should either be dismissed or stayed (FI, NYSCEF # 36). Plaintiff opposed BNYM's motion, and briefing concluded on May 25, 2022 (see FI, NYSCEF #s 62, 68).
On September 1, 2022, while BNYM's motion was pending, the parties agreed to stay proceedings given the First Department's decision in The Western and Southern Life Insurance Company et al. v U.S. Bank National Association (209 AD3d 6 [1st Dept 2022]) to allow for a final resolution of those proceedings (see FI , NYSCEF # 73). Later, with proceedings in Finkelstein I stayed, the parties agreed to a separate stay of Finkelstein II because of an appeal taken in a separate matter pending before the Court of Appeals, captioned IKB International, S.A. v Wells Fargo Bank, N.A., Index No. 2021-01661 (see Finkelstein II, NYSCEF # 17).
The Court of Appeals rendered its ruling in IKB International, S.A. v Wells Fargo Bank, N.A. on June 15, 2023 (40 NY3d 277 [2023]). In that decision, the Court held that, inter alia, plaintiffs' pre-event of default repurchase enforcement claims for certain trusts should be dismissed because the relevant governing agreements for those trusts did not impose an affirmative duty on the trustee to enforce repurchase rights (see id. at 289-290). Two months later, the Finkelstein parties stipulated that the IKB opinion "resolve[d] a legal question at issue" in both Finkelstein I and Finkelstein II, and for that reason, plaintiff agreed to withdraw certain claims for the FHASI 2005-AR6 and NMFT 2006-MTA1 trusts (see FI, NYSCEF # 77; FII, NYSCEF # 19). The parties also agreed that plaintiff would seek leave to amend his complaint in both of the Finkelstein Actions in light of the IKB decision (id. at 2). And the parties agreed that BNYM's motion to dismiss in Finkelstein I would be held in abeyance pending resolution of plaintiff's motion for leave to amend (id.).
Plaintiff filed motions for leave to amend in each of the Finkelstein Actions on September 18, 2023 (FI, NYSCEF # 78; FII, NYSCEF # 20). His proposed complaints sought to assert a pre-event of default (pre-EOD) claim for breach of contract in connection with BNYM's purported failure to require the Trusts' Obligors to cure previously identified document defects and R&W breaches under the Trusts' PSAs (FI, NYSCEF # 78 ¶¶ 212-218). Plaintiff also asserted a post-event of default (post-EOD) claim related to BNYM's purported failure to exercise its post-EOD duties, a claim for breach of the implied covenant of good faith and fair dealing, and a claim for declaratory judgment regarding BNYM's entitlement to indemnification (id. ¶¶ 219-247). BNYM opposed plaintiff's motion to amend and cross-moved to dismiss (see FI, NYSCEF #s 87, 91; FII, NYSCEF #s 29, 33), and briefing on plaintiff's motion and defendant's cross-motion concluded on January 8, 2024 (see FI, NYSCEF # 100; FII, NYSCEF # 42).
On March 11, 2024, while plaintiff's motions to amend were pending before this court, another critical litigation development arose in a separate matter, captioned Finkelstein v U.S. Bank, National Association, Index No. 650849/2021 (the US Bank Action). Plaintiff in the US Bank Action had moved for leave to amend his complaint to assert claims similar to those at issue in his pending motion to amend in the Finkelstein Actions (see US Bank Action, NYSCEF # 197; PAC Ex 3 — March 11 D&O at 3). The court in the US Bank Action, however, denied plaintiff's motion on the grounds that the "lion's share of the claims are palpably insufficient" (the March 11 Order) (see March 11 D&O at 1, 3).
In response to the March 11 Order, plaintiff withdrew his pending motions to amend in the Finkelstein Actions on October 15, 2024 (see FI, NYSCEF # 106; FII, NYSCEF # 47). That same day, plaintiff filed the present motions for leave to amend (see FI, NYSCEF # 107; FII, NYSCEF # 48). As part of the PAC, plaintiff now attempts to assert eight causes of action against BNYM (PAC ¶¶ 239-306). Plaintiff, in particular, sets forth three pre-EOD breach of contract claims in connection with the CXHE 2004-B, CXHE 2006-A, and GEWMC 2005-2 trusts that relate to BNYM's alleged failure to enforce these trusts' rights to have Obligors cure identified document defects, mortgage file completeness R&W breaches, and non-mortgage file completeness R&W breaches (see PAC ¶¶ 239-259 & Ex 7). Plaintiff next asserts three post-EOD breach of contract claims in connection with the FHASI 2005-AR6 trust based on BNYM's purported failure to exercise its post-EOD duties to identify and takes steps to cure document defects, mortgage file completeness R&W breaches, and non-mortgage file completeness R&W breaches (see id. ¶¶ 267-287 & Ex 7). And for all of the Trusts, plaintiff asserts (1) an implied [*2]covenant claim based on BNYM's purported failure to give notice of potential events of default to avoid having to assume prudent person duties, (2) a post-EOD breach of contract claim based on BNYM's failure to identify and take steps to cure events of default arising from the mortgage servicers' failure to perform their duties under the Trusts' governing agreements, and (3) a claim for declaratory judgment related to BNYM's indemnification rights under the PSAs (see id. ¶¶ 8, 288-306).
Plaintiff maintains that the PAC "responds to the March 11 [Order]" and is intended to "make[] it easier for the Court to analyze [p]laintiff's claims" (PAC ¶ 5). Plaintiff adds various additional factual allegations intended to flesh out the nature of the pre- and post-EOD claims it asserts against BNYM, including allegations concerning BNYM's purported awareness of alleged document defects, R&W breaches, and servicing failures, its apparent failure to enforce the Trust's document defect and R&W breach cure rights, its alleged conflict of interests, and its alleged refusal to notice purported events of defaults (see id. ¶¶ 8, 81-85, 106-115, 118, 125-147, 156, 162, 167, 169, 172, 174, 180, 182, 185, 187, 190, 193, 197, 199, 201, 203, 212, 215-237). Plaintiff also asserts new allegations concerning BNYM's lack of entitlement to use the Trusts' funds to defend this action (see id. ¶¶ 86-102). And in addition to these new purported facts, the PAC also adds in a series of allegations related to the timeliness of his claims, arguing that there are five separate bases to conclude that tolling applies to his pre-EOD and post-EOD claims (id. ¶¶ 33-45).[FN7]

Legal Standard
Pursuant to CPLR 3025, "[a] party may amend his or her pleading, or supplement it by setting forth additional or subsequent transactions or occurrences, at any time by leave of court or by stipulation of all parties" (CPLR 3025 [b]). "Leave to amend pleadings should be freely granted in the absence of prejudice or surprise so long as the proposed amendment is not palpably insufficient" (Mashinsky v Drescher, 188 AD3d 465, 466 [1st Dept 2020]).
"A party opposing leave to amend 'must overcome a heavy presumption of validity in [*3]favor of permitting amendment'" (O'Halloran v Metropolitan Transp. Auth., 154 AD3d 83, 86 [1st Dept 2017]). That said, if "[a] proposed amendment [] cannot survive a motion to dismiss," it "should not be permitted" (see Scott v Bell Atlantic Corp., 282 AD2d 180, 185 [1st Dept 2001], affd as modified sub nom. Goshen v Mutual Life Ins. Co. of NY, 98 NY2d 314 [2002]; accord Durst Pyramid LLC v Silver Cinemas Acquisition Co., 222 AD3d 431, 432 [1st Dept 2023] [holding that "Supreme Court providently exercised its discretion to deny that cross-motion, as the proposed cause of action would not have survived a motion to dismiss"]). For this reason, if a proposed amended complaint "would be subject to dismissal as a matter of law," it is, "by definition, 'palpably insufficient or clearly devoid of merit' and thus should not be permitted under CPLR 3025" (see Olam Corp. v Thayer, 2021 WL 408232, at *2 [Sup Ct, NY County, Feb. 5, 2021]).
DISCUSSION
In seeking leave to amend, plaintiff asserts that he has asserted meritorious claims and that those claims timely interposed, either because the claim was asserted in the original claim or through the relation-back doctrine (FI, NYSCEF # 116 — MOL at 5-10; FI, NYSCEF # 133 — Reply at 6-12). BNYM opposes plaintiff's motion (FI, NYSCEF # 122 — Opp), arguing that plaintiff has failed to state any of his pre-EOD or post-EOD claims because they are either devoid of merit, time-barred, or expressly barred under applicable appellate precedent (Opp at 2-25).
The pre-EOD claims will be addressed first followed by the post-EOD claims.
I. Pre-EOD Claims (GEWMC 2005-, CXHE 2004-B, and CXHE 2006-A Trusts)
The PAC asserts the following three pre-EOD claims related specifically to GEWMC 2005-2, CXHE 2004-B, and CXHE 2006-A trusts: (1) a pre-EOD claim related to BNYM's failure to enforce these trusts' rights to have to have mortgage file document defects cured, (2) a pre-EOD claim related to BNYM's failure to enforce these trusts' rights to have R&W breaches relating to mortgage file completeness cured, and (3) a pre-EOD claim related to BNYM's failure to enforce these trusts' rights to have R&W breaches relating to non-mortgage file completeness issues cured (PAC ¶¶ 239-259 & Ex 7). BNYM now contends that these claims fail to state a claim under the PSAs and are, at any rate, untimely.
Because the terms of the PSAs governing the CXHE 2004-B and CXHE 2006-A trusts differ from the PSA governing the GEWMC 2005-2 trust, BNYM's challenges to plaintiff's pre-EOD claims related to CXHE 2004-B and CXHE 2006-A trusts are analyzed first before turning to BNYM's challenges to the pre-EOD claims related to the GEWMC 2005-2 trust.
A. Pre-EOD Claims for CXHE 2004-B and CXHE 2006-A Trusts
BNYM argues that the CXHE 2004-B and CXHE 2006-A trusts' pre-EOD claims are palpably insufficient because their respective PSAs do not set forth an affirmative enforcement duty to cure document defects and R&W breaches in a mortgage loan file. The court agrees.
It is well settled that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms" (W.W.W. Assoc. v [*4]Giancontieri, 77 NY2d 157, 162 [1990]). This principle applies with equal force to those agreements governing RMBS trusts and the rights and duties of their trustees. As the Court of Appeals recognized, "[a] trustee is required to do only what the governing agreements prescribe" (IKB Intl., S.A. v Wells Fargo Bank, N.A., 40 NY3d 277, 285 [2023] [IKB II]; see also AG Cap. Funding Partners, L.P. v State St. Bank & Trust Co., 11 NY3d 146, 156-157 [2008] [explaining that a "trustee under a corporate indenture" has its "rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement"]). Courts therefore must look to the plain terms of RMBS trusts' governing agreements to ascertain the trustee's "circumscribed scope of duties" (IKB II, 40 NY3d at 285).
The Court in IKB II was clear that "[a] pre-EOD trustee's role is essentially ministerial" (IKB, 40 NY3d at 285). Indeed, "a trustee has only a duty to avoid conflicts of interest and a duty to perform ministerial tasks with due care" (id.). That said, in certain circumstances, a trust's governing agreement may expressly impose specific duties on the trustee (id.). This can include, as relevant here, an express affirmative duty to "enforce" a PSA"s "repurchase protocol," i.e., a requirement that an obligated party "either cure, substitute, or repurchase loans that contain document defects or breaches of representations and warranties" (see id. at 285-286). Such an affirmative duty, however, must be apparent from "explicit language" that "provide[s] details regarding the extent of the parties' obligations" (see id. at 288; see also Finkelstein v U.S. Bank, N.A., 219 AD3d 401, 402 [1st Dept 2023] [enforcement duty triggered where "[t]he PSAs for nine of the trusts expressly state that 'the Trustee shall enforce the obligations . . . to repurchase such Mortgage Loan.'"]).
Here, Sections 3.02, 3.04, and 3.06 of the CXHE 2004-B and CXHE 2006-A trusts' PSAs provide the relevant contractual provision governing an Obligors' substitution and repurchase duties in the event of an identified document defect or R&W breach. For instance, Section 3.02(l) provides that
Upon discovery . . . of a breach of any of the representations and warranties set forth in this Section 3.02 which materially and adversely affects the interests of the Owners, the party discovering such breach shall give prompt written notice to the other parties. As promptly as practicable, but in any event within 60 days of its discovery or its receipt of notice of breach, the Servicer shall cure such breach in all material respects
(NYSCEF # 41 § 3.02[l]). Similarly, Section 3.04(a) sets forth that
Upon the discovery . . . that the representations and warranties set forth in clause (b) below were untrue in any material respect . . . as of the [closing date] . . . with the result that the interests of the Owners in the related Home Equity Loan are, or may be, materially and adversely affected, the party discovering such breach shall give prompt written notice to the other parties. . . CHEC hereby covenants and warrants that it shall promptly cure such breach in all material respects or that it shall . . . (i) substitute in lieu of each Home Equity Loan which has given rise to the requirement for action by CHEC a Qualified Replacement Mortgage and deliver the Substitution Amount to the Servicer for deposit in the Principal and Interest Account or (ii) purchase such Home Equity Loan from the Trust . . .
(id. § 3.04[a]). Finally, Section 3.06(b) states that
If the Custodian, on behalf of the Trustee . . . finds any document constituting a part of a [*5]File which is not executed, has not been received, or is unrelated to the Home Equity Loans identified in the Schedule of Home Equity Loans, or that any Home Equity Loan does not conform to the description thereof as set forth in the Schedule of Home Equity Loans, the Custodian, on behalf of the Trustee shall promptly so notify the Depositor, CHEC and the Owners. . . . CHEC agrees to use reasonable efforts to remedy a material defect in a document constituting part of a File of which it is so notified by the Custodian, on behalf of the Trustee. If, however, within 90 days after such notice to it respecting such defect CHEC has not remedied the defect and the defect materially and adversely affects the interest in the related Home Equity Loan of the Owners, CHEC will (or will cause an Affiliate to) . . . (i) substitute in lieu of such Home Equity Loan a Qualified Replacement Mortgage and deliver the Substitution Amount to the Servicer for deposit in the Principal and Interest Account or (ii) purchase such Home Equity Loan . . .
(id. § 3.06 [b]).
Each of these provisions plainly provides for definite cure rights and repurchase obligations for the CXHE 2004-B and CXHE 2006-A trusts. But notably absent from any of these provisions is language conferring a duty upon BNYM to enforce these cure rights and the PSA's repurchase obligations. Under IKB II, this glaring omission constitutes "compelling proof of a lack of an affirmative duty to enforce the repurchase protocol" (see IKB II, 40 NY3d at 289; Finkelstein, 219 AD3d at 402 [declining to find an implied repurchase obligation within the PSA for certain RSMBS trusts because their PSAs lacked an explicit repurchase obligation enforcement provision]).[FN8]
Consequently, plaintiff lacks a basis to assert pre-EOD claims in connection with the CXHE 2004-B and CXHE 2006-A trusts (see e.g. Park Royal I LLC v Wells Fargo Bank, N.A., 2025 WL 1810217, at *5 [Sup Ct, NY County, July 1, 2025 [dismissing pre-EOD claims against defendant where "[s]even of the Trusts in this action [were] governed by agreements [that] do not expressly specify any enforcement obligations on the trustee with respect to pre-event of default document exceptions or R&W breaches"]; Finkelstein v U.S. Bank, 2024 WL 2999117, at *5-6 [Sup Ct, NY County, June 14, 2024 [dismissing pre-EOD claims where trusts did "not have a specific pre-EOD enforcement obligation"]).
To avoid this conclusion, plaintiff points to a separate section of CXHE 2004-B and CXHE 2006-A trusts' PSA—Section 6.03(b)—which provides that BNYM "shall have the power to enforce and shall enforce the obligations and rights of the other parties to this Agreement" (NYSCEF # 41 § 6.03[b]). Plaintiff maintains that this provision confers the requisite enforcement duty upon BNYM with regard to the repurchase obligations set forth in these trusts' PSAs (see Reply at 4-6). Yet, as plaintiff necessarily concedes, Section 6.03(b) explicitly conditions any such enforcement duty by providing that "nothing in this Section shall require any action by the Trustee unless the Trustee shall first (i) have been furnished indemnity [*6]satisfactory to it and (ii) when required by this Agreement, have been requested by the Owners of a majority of the Voting Rights represented by the Certificates then Outstanding" (NYSCEF # 41 § 6.03 [b]). And nothing alleged in the PAC supports a conclusion or inference that either of the conditions in Section 6.03(b) have been satisfied so as to trigger BNYM's purported enforcement duty.
None of plaintiff's contentions offered in his reply suggest a different outcome is warranted. With regard to the first pre-enforcement condition, notwithstanding plaintiff's suggestion to the contrary (Reply at 5), the fact that Section 10.07 may entitle BNYM to indemnification in connection with bringing "legal action" does not mean that it has been "furnished" with indemnification that is "satisfactory to it," and nothing in the PSA suggests a different conclusion (see generally Dreisinger v Teglasi, 130 AD3d 524, 527 [1st Dept 2015] [explaining that contractual provisions "should be accorded their 'fair and reasonable meaning,' and 'the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations'"]). Turning to the second condition, plaintiff maintains that this "condition is easily dealt with" because "nothing in Section 6.03 (or anyplace else in the PSA) requires a certificateholder vote before [BNYM] enforces" the Trusts' various cure rights (Reply at 5). This overly narrow construction of Section 6.03(b) and the PSA more broadly, however, would improperly render Section 6.03(b)'s second condition as "meaningless or without force or effect" (see Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 581 [2017] [reiterating contract-interpretation principle that "a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect'"]). At any rate, the PSA does set forth the circumstances and manner in which certificate holders shall vote on BNYM's ability to exercise its "power to enforce" conferred by Section 6.03 (see e.g. NYSCEF # 41 § 6.11 ["Owners of a majority of the Voting Rights represented by the Certificates then Outstanding may direct the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Certificates or exercising any trust or power conferred on the Trustee with respect to the Certificates or the Trust Estate, including, but not limited to, those powers set forth in Section 6.03"] [emphasis added]). Although not framed in terms of a voting "requirement," this provision, when construed together with other sections of Article 6, further suggests that BNYM's does not possess unilateral a specific enforcement power and duty with respect to, among other things, the PSA's repurchase obligations (see IKB II, 40 NY3d at 286-287 [explaining that PSA provision in which "Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement according to its terms" did not "impose an affirmative duty on the part of the trustee to enforce repurchase obligations, but instead explains that the trustee must act for the benefit of certificateholders when the trustee is exercising the rights described in section 2.06"]).
In short, plaintiff cannot rely on Section 6.03(b) to rescue its pre-EOD claims related to the CXHE 2004-B and CXHE 2006-A trusts. And because the PSAs for these trusts are silent on any affirmative duty to enforce their repurchase obligations, plaintiff's pre-EOD claims for these two trusts must fail as a matter of law. Therefore, plaintiff's motion for leave to amend to add any pre-EOD claims in connection with the CXHE 2004-B and CXHE 2006-A trusts is denied.
B. Pre-EOD Claims for GEWMC 2005-2 Trust
The next set of contested pre-EOD claims in the PAC are those asserted in connection with the GWMC 2005-2 trust. Although it does not challenge the sufficiency of these claims as pleaded (cf. Opp at 2-4 [addressing sufficiency of pre-EOD claims for CXHE 2004-B and CXHE 2006-A trusts]), BNYM nevertheless asserts that these claims fail because they are time-barred (Opp at 15-18). Specifically, BNYM avers, Section 2.03 of the GEWMC 2005-2 trust's PSA required BNYM to enforce any repurchase obligation within 90 days, and this timing requirement was triggered upon BNYM's preparation and delivery of any certification and exception report required under the PSA (id. at 16). The court agrees.
The inquiry for whether plaintiff's pre-EOD claims for the GEWMC 2005-2 trust are time-barred turns, at least in part, on the plain terms of the PSA. If "[t]he governing agreements did not specify how soon after the sellers' failure to cure that defendants were required to initiate a putback action," "what would be a reasonable time, in lieu of a specified time, cannot be determined at this stage" (IKB Intl., S.A. v Wells Fargo Bank, N.A., 208 AD3d 423, 429 [1st Dept 2022], affd as modified 40 NY3d 277 [2023] [IKB I]; Zittman v The Bank of NY Mellon, 2022 WL 1471264, at *3 [Sup Ct, NY County, May 10, 2022] [observing that the outset of the trustee's performance period is six years after closing since the specific time could not be properly resolved at the pleading stage]). Conversely, if a PSA specifies a particular time for the trustee to perform its duties, then investors' claims accrue upon the trustee's failure to perform by that time (Phoenix Light SF Ltd. v Wells Fargo Bank, N.A., 2022 WL 2702616, at *24-25 [SD NY, July 12, 2022, No. 14 Civ. 10102 (KPF) (SN), 15 Civ. 10033 (KPF) (SN)] [finding claims untimely with respect to three trusts for which the PSAs specified the trustee's time to enforce, while refusing to dismiss claims concerning other trusts for which the PSAs did not provide a time]; Ambac Assur. Corp. v U.S. Bank N.A., 632 F Supp 3d 517, 535 [SD NY 2022] [explaining that "in cases where the PSA set a deadline, that deadline governed"]).
Here, Section 2.03(a) of the PSA provides, in relevant part, that in the event of a discovery or receipt of notice of a materially defective or missing document from the mortgage file or an R&W breach,
the Trustee shall promptly notify the Originator. . . of such defect, missing document or breach and request that the Originator deliver such missing document or cure such defect or breach within 90 days from the date the Originator had knowledge or was notified of such missing document, defect or breach, and if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Originator under the related Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within 90 days after the date on which the Originator was notified . . . of such missing document, defect or breach . . .
(NYSCEF # 39 § 2.03[a]). In other words, the PSA provided for an express 90-day period for BNYM to perform its enforcement duty under Section 2.03 and did not set forth any continuing obligation beyond that 90-day period.
It follows then that, because BNYM allegedly executed certifications and notices identifying document defects and R&W breaches that Obligors were obligated to cure by the time the GEWMC 2005-2 trust closed on December 19, 2005, those certifications and notices—which were delivered 45 days after closing (i.e., February 2, 2006) and purportedly identified various document defects and R&W breaches—also triggered BNYM's duty to enforce the PSA's repurchase obligations within 90 days under the plain terms of Section 2.03(a) [*7](see PAC ¶¶ 109-115 & Ex 1; see NYSCEF # 39 §§ 1.01, 2.02, 203). Therefore, applying the requisite six-year statute of limitations for breach of contract claims, plaintiff's pre-EOD claims for the GEWMC 2005-2 trust expired no later than 2012, i.e., almost 9 years prior to the filing of this action (see Guzman v 188-190 HDFC, 37 AD3d 295, 297 [1st Dept 2007] [holding that six-year statute of limitations begins to run when defendant "omitted performance of an obligation" under the agreement]). So even accounting for any available tolling alleged by plaintiff, his pre-EOD claims for the GEWMC 2005-2 trust are plainly time-barred (see Zittman v HSBC Bank USA, N.A., 224 AD3d 638, 639 [1st Dept 2024] [concluding that claim time-barred under substantially similar PSA provisions]; Phoenix Light SF Ltd., 2022 WL 2702616 at *24 n31 [same]).
Plaintiff's motion for leave to amend to add pre-EOD claims related to the GEWMC 2005-2 trust is denied.
II. Post-EOD Claims
In addition to pre-EOD claims, the PAC also asserts two categories of post-EOD claims. First, as to all Trusts, plaintiff's post-EOD servicing claim arises out of BNYM's purported failure to cure servicing failures in connection with mortgages pooled into the Trusts (PAC ¶¶ 288-294 & Ex 7). Second, as to the FHASI 2005-AR6 Trust, plaintiff asserts a series of post-EOD document delivery claims related to purported document defect and R&W breaches (id. ¶¶ 267-287 & Ex 7). In his motion, plaintiff maintains that these claims are properly pleaded and meritorious (see MOL at 14; Reply at 6-9). BNYM disagrees, averring that plaintiff's post-EOD claims fails to plead to any breach actually occurred in each of the Trusts (Opp at 5-11). Plaintiff's post-EOD Servicing Claims will be reviewed first, followed by his document delivery claims for the FHASI 2005-AR6 Trust.
A. Servicing Claim (All Trusts)
The crux of plaintiff's post-EOD servicing claim is that BNYM had a duty to exercise "such of the rights and powers vested in" it by the PSAs upon the occurrence of an event of default, and that BNYM breached this duty by (1) failing to ensure that servicing failures were cured, and (2) failing to take reasonable steps to investigate the source and nature of these defaults (see PAC ¶¶ 228-237, 288-294). BNYM, in opposition, offers several grounds to challenge the sufficiency of this claim. Among other things, BNYM contends that plaintiff failed to allege that the Servicers had actual knowledge of an event of default, that BNYM was on notice of an EOD as required under the PSAs, or that, even if BNYM were on notice, that written notice was provided to the servicer by an authorized party (id. at 7-9).
As with plaintiff's pre-EOD claims, to ascertain the "rights, duties and obligation" of BNYM as trustee of the Trusts, the court must look "exclusively" to "the terms of the agreements by which the relationships were formed," here, the PSAs (see Cece & Co. Ltd. v U.S. Bank N.A., 153 AD3d 275, 279 [1st Dept 2017]). To that end, upon the occurrence of a servicer event of default, the PSAs for the Trusts require BNYM to "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs" (see e.g. NYSCEF # 39 § 8.01). And to trigger this "prudent person" [*8]obligation, the PSAs also generally require that the Trustee, through a "Responsible Officer of the Trustee," had "actual knowledge" or received "written notice" that an event of default had occurred (see NYSCEF # 39 § 7.01; NYSCEF # 41 § 10.01[a]; NYSCEF # 42 § 10.01[a]; NYSCEF # 43 § 10.01[a]). As relevant here, for the GEWMC 2005-2, CXHE 2004-B, CXHE 2006-A, and NMFT 2006-MTA1 trusts, a servicer event of default under the PSAs occurs if a servicing officer for a mortgage fails to duly "observe or perform in any material respect any of the covenants or agreements on the part of the Servicer contained in this Agreement," and that failure goes unremedied for a period of 45 days after ether earlier of "written notice of such failure" or "actual knowledge of such failure by a Servicing Officer of the Servicer" (see e.g. NYSCEF # 39 § 7.01[ii]; PAC ¶¶ 229-231; see also NYSCEF # 41 § 8.20(iii) [declaring an event of default if a service "fail[s] to perform any one or more of its obligations . . . which materially and adversely affects the interests of the Owners after the earlier of (a) actual knowledge of an officer of the Servicer or (b) receipt of notice from the Trustee of said failure"]; NYSCEF # 42 § 8.20(iii) [same]; NYSCEF # 43 § 8.01 [similar]).
Here, even if there are no specific allegations of "written notice" in the PAC, plaintiff has alleged sufficient facts supporting a reasonable inference that the GEWMC 2005-2, CXHE 2004-B, CXHE 2006-A, and NMFT 2006-MTA1 trusts' servicers and BNYM had actual knowledge of servicer events of default. In the PAC, plaintiff details the many servicing failures uncovered throughout the course of RMBS-related investigations, hearings, and litigation that related to the servicers appointed for the Trusts (PAC ¶¶ 108-213). Plaintiff maintains that this extensive history of servicing failures establishes the Trusts' servicers "actual knowledge" of a circumstance trigger an event of default (id. ¶¶ 229-230). Plaintiff also repeatedly alleges that, given the prominence of the public disclosure of the facts and circumstances alleged in these investigations, BNYM was, upon information and belief, aware of these purported servicing failures (see e.g. id. ¶¶ 156, 162, 167, 169, 172, 174, 180, 182, 185, 187, 190, 193, 197, 199, 201, 203). Yet despite this awareness, plaintiff continues, BNYM allowed to the events of default to continue and failed to otherwise investigate these events of default (see id. ¶ 228). Plaintiff also avers that servicing breaches were evident from the annual statements of compliance issued by the servicers (see id. ¶ 235).
To be sure, these allegations do not "inexorably lead to the conclusion that" any of the Trusts' servicers or BNYM "had actual knowledge that the [s]ervicers were in breach as to any particular trust" (see Phoenix Light SF Ltd. v Bank of NY Mellon, 2015 WL 5710645, at *4 [SD NY, Sept. 29, 2015, No. 14-CV-10104 (VEC)]). However, on a motion for leave to amend, "it is sufficient for [p]laintiff[] to allege facts that plausibly suggest a likelihood" of the requisite knowledge of an event of default (id. [denying motion to dismiss breach of contract claim where complaint alleged that "BNYM was on notice of so many deficiencies surrounding the mortgages—including missing paperwork, underwriting failures, and other seller breaches—that it surely would have conducted a minimal, albeit (perhaps) not contractually required, investigation that would have unearthed the Servicer misconduct, which, Plaintiffs allege, constitutes one or more Events of Default"]; see also IKB I, 208 AD3d at 429 [concluding that trial court correctly declined to dismiss where "[p]laintiffs allege that the trustees received written notice of servicing breaches from investors and insurers, and in connection with governmental investigations and private litigation, and that the breaches were also evident from the servicers' written reports"]; Phoenix Light SF Ltd. v Deutsche Bank Natl. Trust Co., 172 F Supp 3d 700, 715-716 [SD NY 2016] [denying motion to dismiss breach of contract claim where [*9]"SAC alleges actual knowledge by describing Deutsche Bank's involvement in RMBS litigation and receipt of notices from monoline insurers who were pursuing actions against servicers, as well as alarming rates of default and rating downgrades"]; Royal Park Investments SA/NV v Bank of NY Mellon, 2016 WL 899320, at *6 [SD NY, Mar. 2 2016, No. 1:14-cv-6502-GHW] [concluding that plaintiff's "reliance on government actions, difficulties in foreclosing mortgage loans, and media coverage about rampant servicing problems" sufficiently alleged actual knowledge by trustee of servicer events of default]). And after coupling these allegations of actual knowledge with those facts in the PAC supporting plaintiff's claim that BNYM failed to exercise its "prudent person duties" (see PAC ¶¶ 215-228, 237), the court cannot conclude that plaintiff's post-EOD servicing claim is palpably insufficient or devoid of merit as it relates to the GEWMC 2005-2, CXHE 2004-B, CXHE 2006-A, and NMFT 2006-MTA1 trusts.
However, the conclusion is different with regard to the post-EOD servicing claims raised on behalf of the FHASI 2005-AR6 trust. As the PAC makes clear, a servicer event of default for this trust occurs if a master servicer fails to "observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer" (PAC ¶ 233). But unlike the other trusts, the FHASI 2005-AR6 trusts' PSA requires "written notice of such failure" by an authorized entity—to wit, BNYM, the trust's depositor, or "the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates"—and does not include an "actual knowledge" alternative for notice (see id.). Because no such written notice from an authorized party is alleged in the PAC, plaintiff's post-EOD servicing claim asserted in connection with the FHASI 2005-AR6 trust is palpably insufficient and devoid of merit (see IKB I, 208 AD3d at 429 [concluding that post-EOD claims for certain trusts should be dismissed where the trusts' PSAs required written notice and plaintiff failed to allege written notice "came from a party authorized to provide such notice"]; Bakal v U.S. Bank N.A., 747 Fed Appx 32, 35-36 [2d Cir 2019] [affirming dismissal of breach of contract claim where PSA expressly provided that a servicer event of default only occurred upon "written notice" by an authorized party and plaintiff failed to plead facts suggesting such a notice occurred]).
In sum, plaintiff's motion for leave to amend to add a post-EOD servicing claim for the GEWMC 2005-2, CXHE 2004-B, CXHE 2006-A, and NMFT 2006-MTA1 trusts is granted, but plaintiff's motion with respect to the FHASI2005-AR6 trust is denied.
B. Post-EOD Document Delivery Claims (FHASI 2005-AR6 Trust)
Plaintiff separately asserts various post-EDO document delivery claims on behalf of the FHASI 2005-AR6 trust (see PAC ¶ 232). As noted above, the FHASI 2005-AR6 PSA provided that an Event of Default would trigger upon the occurrence of, among other things,
any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement, which failure materially affects the rights of Certificateholders, which failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; provided, however, that the 60-day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu thereof
(PAC ¶ 233). Plaintiff, in turn, alleges that the FHASI 2005-AR6 trust "was in a state of default from the date it closed until every Mortgage File was complete" (id. ¶ 234). Plaintiff avers, upon information and belief, that this did not occur following the initial delivery, and for this reason, BNYM's prudent person duties triggered in connection with any post-EOD document defect and R&W breaches because of these events of default (see id. ¶¶ 234, 267-287).
As BNYM aptly notes in opposition (see Opp at 10), these claims are devoid of merit because, even assuming the mortgage files for the FHASI 2005-AR6 trust were not complete on the date of closing, the delivery obligations identified in this PSA provision are imposed on the depositor, not the servicer. Plaintiff offers no basis in the PAC for the court to even infer how, if at all, the FHASI 2005-AR6 trust's depositor's initial delivery of incomplete mortgage file amounted to the trust's servicer's event of default that would give rise to BNYM's prudent person duty.[FN9]
Consequently, plaintiff's motion for leave to amend to add post-EOD document delivery claims is denied.
III. Implied Covenant Claim (All Trusts)
In addition to contractual claims arising under specific provision of the PSA, plaintiff also asserts a claim for breach of the implied covenant of good faith and fair dealing based on BNYM's failure and/or refusal to give notice of potential events of default arising under the PSAs (PSA ¶¶ 260-266). But a review of the PAC reveals that his implied covenant claim arises out of the same facts underlying his pre-EOD and post-EOD breach of contract claims and seeks the same damages (cf. id. ¶¶ 239-259 [alleging that BNYM failed to require the Trusts' Obligors to cure identified document defects and R&W breaches]; id. ¶¶ 267-287 [alleging that BNYM failed to exercise its "prudent person" duties to cure and investigate document defects and R&W breaches]; id. ¶¶ 288-294 [alleging that BNYM failed to exercise its "prudent person" duties to cure and investigate servicing failures]]). As a consequence, the implied covenant claim is duplicative and therefore palpably insufficient as a matter of law (see Mill Fin., LLC v Gillett, 122 AD3d 98, 104-105 [1st Dept 2014] ["Where a good faith claim arises from the same facts and seeks the same damages as a breach of contract claim, it should be dismissed"]; MBIA Ins. Corp. v Countrywide Home Loans, Inc., 87 AD3d 287, 297 [1st Dept 2011] [dismissing implied covenant claim as duplicative where it arose out of same set of facts as breach of contract claim]; see also Val Tech Holdings v Wilson Manifolds, Inc., 119 AD3d 1327, 1331 [4th Dep 2014] [holding that court erred in granting leave to amend where implied covenant claim was duplicative of breach of contract claim]). Therefore, plaintiff's motion for leave to amend to add [*10]an implied covenant claim is denied.[FN10]

IV. Indemnification Claim (All Trusts)
Plaintiff's final cause of action in his PAC is a claim for declaratory judgment regarding BNYM's indemnification rights under the Trusts' PSAs (PAC ¶¶ 295-306). Ultimately, because at least one of plaintiff's breach-of-contract claims in the PAC can proceed and may result in a finding of negligence or wrongful conduct if proven, there is a sufficient basis for plaintiff to maintain his declaratory judgment claim at this juncture. For this reason, plaintiff's indemnification claim is neither palpably insufficient nor devoid of merit (Zittman, 2022 WL 1471264, at *11 [granting declaratory judgment where "Trustee could seek indemnification from the Trusts except for expenses incurred by reason of willful misfeasance, bad faith, or negligence"]). None of BNYM's fact-intensive arguments alter this conclusion (see Opp at 11-14). Therefore, plaintiff's motion for leave to amend to revise its indemnification claim is granted.
V. Defendant's Motion to Dismiss the Original Complaint in Finkelstein I
Because plaintiff's motion for leave to amend is granted in part, his original complaint will no longer be the operative complaint in this action. BNYM's pending motion to dismiss the original complaint in Finkelstein I is therefore denied as moot.
Conclusion
For the foregoing reasons, it is hereby
ORDERED that plaintiff's motion, pursuant to CPLR 3025(b), for leave to amend filed in the matters captioned Finkelstein v Bank of New York Mellon, Index No. 651222/2021 (MS004) and Finkelstein v Bank of New York Mellon, Index No. 653713/2022 (MS002), are granted insofar as permitting plaintiff to assert (1) post-Event of Default servicing claims for the GEWMC 2005-2, CXHE 2004-B, CXHE 2006-A, and NMFT 2006-MTA1 trusts, and (2) a claim for declaratory judgment in connection with defendant's right to indemnification under the relevant trust governing agreements, and it is denied in all other respects; and it is further
ORDERED that defendant's motion, pursuant to CPLR 3211(a)(5) and (a)(7), filed in the matter captioned Finkelstein v Bank of New York Mellon, Index No. 651222/2021 (MS002) is denied as moot; and it is further
ORDERED that within twenty (30) days of the e-filing of this Decision and Order, plaintiff shall (i) e-file a copy of his amended complaint that is consistent with this Decision and Order on the docket for Finkelstein v Bank of New York Mellon, Index No. 651222/2021, and Finkelstein v Bank of New York Mellon, Index No. 653713/2022; and (ii) serve a copy of the amended complaint on defendant in each action; and it is further
ORDERED that defendant shall answer or otherwise move within thirty (30) days from the date of service in each of those matters; and it is further
ORDERED that a preliminary conference in Finkelstein v Bank of New York Mellon, Index No. 651222/2021, and Finkelstein v Bank of New York Mellon, Index No. 653713/2022 shall be held via Microsoft Teams on October 22, 2025, at 10:30 AM or at such other time that the parties shall set with the court's law clerk. Prior to the conference, the parties shall first meet and confer to stipulate to a preliminary conference order, available at https://www.nycourts.gov/LegacyPDFS/courts/comdiv/NY/PDFs/part49-PC-Order-fillable.pdf, in lieu of a conference; and it is further
ORDERED that counsel for plaintiff is directed to serve a copy of this order, together with notice of entry, upon defendant and the Clerk of the Court within 10 days of this order.
DATE 07/23/2025
MARGARET A. CHAN, J.S.C.

Footnotes

Footnote 1:By Stipulation, dated February 4, 2022, Finkelstein I was consolidated with a related action, captioned Finkelstein v The Bank of New York Melon, Index No. 655302/2021 (FI, NYSCEF # 31).

Footnote 2:In its oppositions filed in Finkelstein I and Finkelstein II, respectively, BNYM indicates that it has also cross-moved to dismiss the PAC (see FI, NYSCEF # 122; FII, NYSCEF # 64). BNYM, however, did not file a notice of cross-motion in response to plaintiff's motion to amend. Hence, no motion to dismiss is pending in either Finkelstein I or Finkelstein II in connection with the PAC (see generally CPLR 2214 ["any notice of cross-motion, with supporting papers, if any, shall be served at least seven days before such time if a notice of motion served"]).

Footnote 3:An identical copy of the PAC was filed in Finkelstein II (see FII, NYSCEF # 49). For ease of reference, citations to the PAC in this Decision and Order will be to the copy filed in Finkelstein I.

Footnote 4:Specifically, CXHE 2004-B closed on March 25, 2004, CXHE 2006-A closed on May 16, 2006, GEWMC 2005-2 closed on December 19, 2005, FHASI 2005-AR6 closed on December 29, 2005, and NMFT 2006-MTA1 closed on June 8, 2006 (PAC Ex 8).

Footnote 5:PSAs for CXHE 2004-B, CXHE 2006-A, GEWCMC 2005-2, and NMFT 2006-MTA1 were previously filed as part of BNYM's pending motion to dismiss. But in connection with the present motions to amend, plaintiff only filed excerpts of relevant sections (see FI, NYSCEF #s 123, 124, 125, 129, 130, 131). For completeness, the court will cite to the full PSAs previously filed on the docket.

Footnote 6:The PSAs provided for various types of events of default. For example, a servicer event of default triggered under the CXHE 2004-B, CXHE 2006-A, and GEWMC 2005-2 trusts where a "Servicing Officer" had "actual knowledge" of a failure to perform prudent servicing obligations, or the mortgage servicers failure to perform its duties "after having been given notice and an opportunity to cure" (PAC ¶¶ 228-229). Meanwhile, a servicer event of default would trigger for the FHASI 2005-AR6 trust in the event that the mortgage servicer failed to deliver all portions of the mortgage file to the trustee by the closing date and failed to cure this issue during a 60-day cure period upon receipt of "written notice" (id. ¶¶ 232-235).

Footnote 7:Exhibit 8 of the PAC alleges that the statute of limitation on plaintiff's R&W breach claims originally ran for a total 12 years after the closing of the Trusts. But after accounting for the various forms of tolling applicable to his claims, plaintiff asserts that the earliest possible statute of limitations' expiration dates are (1) October 8, 2021 for the CXHE 2004-B trust, (2) November 29, 2023 for the CXHE 2006-A trust, (3) July 4, 2023 for the GEWMC 2005-2 trust, (4) December 22, 2023 for the NMFT 2006-MTA1 trust, and (5) July 14, 2023 for the FHASI 2005-AR6 trust (PAC Ex 8). Separately, Exhibit 9 to the PAC provides plaintiff's proposed accrual and tolling calculations for his document defect claims (id. Ex 9). For the CXHE 2004-B, CXHE 2006-A, and GEWMC 2005-2 trusts, plaintiff maintains that, after accounting for any tolling, the earliest that the statute of limitations would have expired if calculated from closing date is October 8, 2021 for the CXHE 2004-B trust, November 29, 2023 for the CXHE 2006-A trust, and July 4, 2023 for the GEWMC 2005-2 trust (id.). Meanwhile, the earliest date earliest that the statute of limitations would have expired if calculated from the accrual date is January 6, 2023 for the CXHE 2004-B trust, February 26, 2025 for the CXHE 2006-A trust, and October 1, 2024 for the GEWMC 2005-2 trust (id.).

Footnote 8:By contrast, Section 2.03 of the PSA for the GEWMC 2005-2 Trust explicitly states that "if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the obligations of the Originator under the related Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan from REMIC I at the Purchase Price within 90 days after the date on which the Originator was notified" (NYSCEF # 39 § 2.03[a] [emphasis added]).

Footnote 9:Plaintiff's asserts that "First Horizon" acts as the depositor, seller, and master servicer for the FHASI 2005-AR6 trust (Reply at 7-8). But the PSA for the FHASI 2005-AR6 trust is clear that the depositor and master service are two separate entities (see NYSCEF # 128 at pdf 4). To be sure, both entities appear to be related, but plaintiff fails to allege any facts to support even an inference that these separate entities can or should be viewed as one in the same for purposes of triggering a servicer event of default.

Footnote 10:Insofar as plaintiff relies on the Streit Act, courts have repeatedly held that the Streit Act does not impose any post-Event-of-Default duties on a trustee (see Phoenix Light SF, 172 F Supp 3d at 723 [holding that the Streit Act "does not create any additional duties for trustees beyond the duties in the PSAs"]; Park Royal I LLC v HSBC Bank USA, N.A., 2022 WL 1689873, at *11 [Sup Ct, NY County, May 25, 2022] [observing that "the statute does not independently impose any affirmative duties on trustees"]; Finkelstein v U.S. Bank, 2024 WL 1052878, at *4 [Sup Ct, NY County, Mar. 11, 2024] ["the Streit Act does not serve to impose any duties on the Trustee not expressly included in these agreements"]).